UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| THERESA ALLEN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 4:10-CV-1406 (CEJ) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

**I. Procedural History**

On March 26, 2008, plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and an application for supplemental security income disability benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 120-125). Plaintiff claimed disability due to a combination of physical impairments, including fibromyalgia, arthralgias, myalgias, migraine headaches, and asthma.[1] (Tr. 11). According to plaintiff, her disability began on September 30, 2006. (Tr. 9). On June 25, 2008, plaintiff's applications were denied by the defendant. (Tr. 68-73). At the plaintiff's request, a hearing was held before an

---

[1] Fibromyalgia is a common syndrome in which a person has a long-term, body-wide pain and tenderness in the joints, muscles, tendons, and other soft tissues. http://www.nlm.nih.gov.

Arthralgias is a pain in a joint. Taber's Cyclopedic Medical Dictionary (14th ed. 1981).

Myalgias is tenderness or pain in the muscles. Taber's Cyclopedic Medical Dictionary (14th ed. 1981).

Administrative Law Judge (ALJ) on August 19, 2009.  (Tr. 19).  At the hearing, the ALJ heard testimony from plaintiff and Brenda Young, a vocational expert.  (Tr. 19-63).

On October 6, 2009, the ALJ found that plaintiff was not disabled and denied her claims for benefits.  (Tr. 9-16).  On November 25, 2009, plaintiff requested review of the ALJ's decision by the Appeals Council.  (Tr. 118).  On June 18, 2010, the Appeals Council denied plaintiff's request.  (Tr. 1-5).  Accordingly, the ALJ's determination stands as the final decision of the Commissioner.  42 U.S.C. §405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 34 years old and lived in St. Louis, Missouri with her boyfriend and three children, aged six, eight, and twelve years old. (Tr. 23).  Plaintiff testified that her physical problems began in the summer of 2006, after she fell off a six-foot ladder at work.  (Tr. 27-28).

After graduating from high school, plaintiff worked as a waitress from 1994 to 2004.  (Tr. 30).  The job required her to frequently lift items weighing up to 20 pounds. (Tr. 30).  Plaintiff then worked at a GNC nutrition store for approximately six months. (Tr. 30-31).  Her job duties included cleaning the store, putting stock away, and working as a cashier.  (Tr. 30).  At GNC, plaintiff stated that she lifted items that weighed more than twenty pounds.  (Tr. 31).  Plaintiff also worked as a salesperson, a job in which she was responsible for answering phone calls and going out on sales leads.  (Tr. 31).  In 2006, plaintiff began working full-time at Walgreens.  (Tr. 27). Initially, plaintiff worked as a senior beauty advisor, but later became a cashier.  (Tr. 27). Plaintiff at work on August 21, 2006 when she fell from a six-foot ladder. Plaintiff continued to work for Walgreens until September 30, 2006. (Tr. 27-30).  After that date, plaintiff did occasional work for about a year as a lunch monitor for children at

a church.  At the time of the hearing, plaintiff was a self-employed Avon representative.  Her work involved dropping off order books at various locations, sometimes with the assistance of her children.  (Tr. 25-29).

Plaintiff begins a typical day by getting up at 8:00 or 9:00 a.m.  (Tr. 32). Plaintiff testified that because she feels stiff and tired in the morning it takes her fifteen minutes to an hour to get out of bed.  (Tr. 32).  Once plaintiff gets "moving," she cooks breakfast for her children.  (Tr. 32).  She then spends time with them playing, reading, or watching a movie.  (Tr. 32).   In the afternoons, plaintiff takes a nap for two to four hours.  (Tr. 35).  Plaintiff claims that she cannot through an entire day without taking a nap.  (Tr. 54).  After her nap, plaintiff checks her email and performs household duties.  (Tr. 35).  Plaintiff is capable of doing some household chores, such as cooking, making beds, and washing dishes.  (Tr. 33-34).  However, plaintiff testified that she cannot vacuum, carry groceries, mop, or sweep.  (Tr. 33-34).  On the weekends, plaintiff testified that she likes to take her children to the park or to the movie theater. (Tr. 36).  She testified that she has friends and considers herself sociable.  (Tr. 36). Plaintiff is also an active member of her church.  (Tr. 36).

Plaintiff testified that she experiences difficulty walking up stairs and lifting items.  (Tr. 23, 49).  Plaintiff cannot physically lift her children and cannot lift more than twenty-five pounds.  (Tr. 32, 49).  Plaintiff also has problems with standing or sitting for long periods of time.  (Tr. 49).  She can stand for only ten minutes and can walk only a distance of one block.  (Tr. 48-49).  Plaintiff also testified that she has problems bending.  (Tr. 49).

Plaintiff testified that her pain is the result of fibromylagia located in her legs, rear, and back. (Tr. 51).  In addition to physical pain, plaintiff also testified that she

3

experiences diarrhea two or three times a week. (Tr. 56). To reduce her pain, plaintiff takes various medications. (Tr. 39-48). Plaintiff testified that she takes Cymbalta for her fibromyalgia pain.[2] (Tr. 38). Plaintiff, however, claims that the medication does not work. (Tr. 38). Plaintiff testified that on a scale from 1 to 10 (with 10 being the worst) her pain from fibromylagia is an 8 on a good day and a 10 on a bad day. (Tr. 43-44). In addition to Cymbalta, plaintiff also takes several medications for her allergy problems. (Tr. 38-39). Plaintiff takes Flovent, Alocril, Flonase, Zyrtec, and Nexium for her allergies.[3] (Tr. 39-40). Plaintiff also uses an Albuterol inhaler for asthma.[4] (Tr. 38). Plaintiff takes Maxalt for migraine headaches that occur two or three times a week. (Tr.

---

[2]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[3]Flovent is indicated for the maintenance treatment of asthma as a prophylactic therapy. See Phys. Desk Ref. 1448 (61st ed. 2007).

Alocril is used to treat itchy eyes caused by allergies. Symptoms of allergies occur when cells in your body called mast cells release substances after you come in contact with something to which you are allergic. Nedocromil is in a class of drugs called mast cell stabilizers. It works by stopping the release of these substances. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000174/

Flonase is used to treat the symptoms of seasonal (occurs only at certain times of year), and perennial (occurs all year round) allergic rhinitis and perennial nonallergic rhinitis. These symptoms include sneezing and stuffy, runny, or itchy nose. Fluticasone is in a class of medications called corticosteroids. It works by preventing and decreasing inflammation (swelling that can cause other symptoms) in the nose. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000953/

Zyrtex is indicated for relief of symptoms associated with allergic rhinitis and for treatment of hives. See Phys. Desk Ref. 2595 (61st ed. 2007).

Nexium is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus (the tube between the throat and stomach). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001062/

[4]Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. See Phys. Desk Ref. 3067 (60th ed. 2006).

4

39).[5] Plaintiff testified that she takes Nortriptyline for irritable bowel syndrome (IBS).[6] (Tr. 41). Plaintiff also testified that she takes Naproxen for pain in her nerves and joints.[7] (Tr. 41). In addition to the above conditions, plaintiff also complained of having Raynaud's Syndrome which affects the strength and tenderness of her fingers.[8] (Tr. 46).

The ALJ also heard testimony from Brenda Young, a vocational expert. Ms. Young testified that plaintiff was precluded from past relevant work. (Tr. 61). However, Ms. Young opined that plaintiff could perform light work as a receptionist or an information clerk job. (Tr. 62).

### III. Medical Records

On June 9, 2006, plaintiff visited Anthony Kulczycki, M.D. (Tr. 418). Plaintiff reported daily headaches, pressure around her eyes, frequent coughs, and shortness of breath. (Tr. 419). After conducting a physical examination, Dr. Kulczycki concluded that plaintiff had seasonal and perennial allergic rhinitis. (Tr. 419). Plaintiff's skin tests indicated that she was allergic to oak, maple, dog, and dust mite. (Tr. 419). Dr.

---

[5] Maxalt is used to treat the symptoms of migraine headaches (severe, throbbing headaches that sometimes are accompanied by nausea and sensitivity to sound and light). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000096/

[6] Nortriptyline is a tricyclic antidepressant. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html (last visited on May 25, 2010).

Irritable bowel syndrome (IBS) is a disorder that leads to abdominal pain and cramping, changes in bowel movements, and other symptoms.

[7] Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

[8] Raynaud's disease is a condition that causes some areas of your body — such as your fingers, toes, tip of your nose and your ears — to feel numb and cool in response to cold temperatures or stress. http://www.mayoclinic.com/health/raynauds-disease/DS00433

Kulczycki concluded that plaintiff also suffered from chronic headaches and that she had large tonsils with inflammation. (Tr. 419).

On August 22, 2006, plaintiff went to the emergency room at St. Mary's Health Center. (Tr. 309).  Plaintiff reported that she had fallen from a five- or six-foot ladder at work.  (Tr. 309).  She complained of pain in her ribs, spine and abdominal.  (Tr. 309).  Multiple x-rays were obtained, all of which were negative and showed no apparent fractures.  (Tr. 309).  Plaintiff was diagnosed with chest, back, and pelvic pain. (Tr. 309).  She was given Percocet for the pain and Valium for her muscle spasms.[9]   (Tr. 309).

In October 2006, plaintiff was examined by Brett Taylor, M.D.  (Tr. 356).  Plaintiff told Dr. Taylor about her fall and complained of back, leg, and arm pain.  (Tr. 356).  After conducting an examination, Dr. Taylor concluded that  plaintiff had a musculoskeletal disorder. (Tr. 362).  Dr. Taylor opined that plaintiff was "at maximal medical improvement in regard to her spine" and that she could return to work without any limitations.  (Tr. 362).

On February 9, 2007 plaintiff saw Dr. Kulczycki, complaining that her headaches had been getting worse and that she had pain in her ribs. After a physical examination, Dr. Kulczycki concluded that plaintiff was still suffering from seasonal and perennial allergic rhinitis.  Dr. Kulczycki found that plaintiff "does not have asthma at this time in our office environment."  However, he could not rule out the possibility of allergens

---

[9]Percocet is a combination of Oxycodone and Acetaminophen.  Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

Valium is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000556 /

6

in plaintiff's house as a cause of her pulmonary and headache problems. It was suggested that plaintiff move out of her house for several weeks. It was also suggested that plaintiff avoid caffeine and stop taking birth control pills in order to determine whether they might be the cause of her headaches. Dr. Kulczycki noted that Rozerem, a sleeping aid, might be helpful if plaintiff's headaches were due to lack of restful sleep. It does not appear from the notes of the visit that this drug was actually prescribed. Plaintiff was given an Albuterol sample and was told to continue taking Zyrtex, Flonase, and Nasonex for her allergies. (Tr. 415-416).

On February 13, 2007, plaintiff was examined by Alan Weiss, M.D., after reporting shortness of breath (Tr. 199). Dr. Weiss performed a chest radiograph and concluded that plaintiff had no abnormalities or disorders in her heart or lungs. (Tr. 199, 215).

On March 5, 2007, plaintiff visited her primary physician, Sam Hawatmeh, M.D. (Tr. 395). Plaintiff reported headaches, a runny nose, and throat and ear pain. (Tr.395). Dr. Hawatmeh prescribed Midrin for the headaches.[10] (Tr. 293). A few weeks later, plaintiff saw Raymond Cohen, D.O. (Tr. 292). Plaintiff complained of constant pain and stiffness in her neck, which increased with movement. (Tr. 292-293). She also claimed that she had lower back pain and problems sleeping throughout the night. (Tr. 292-293). Plaintiff also stated that she suffered from headaches. (Tr. 293). Dr. Cohen performed a physical and neurological exam on plaintiff. (Tr. 294). Based on the results of the exam, Dr. Cohen diagnosed plaintiff with moderately severe cervical myofascial pain disorder with cervicogenic headaches. (Tr. 295). Plaintiff was also diagnosed with a chronic lumbar strain. (Tr. 295). Dr. Cohen concluded that

---

[10] Midrin is used to relieve migraine and tension headaches. www.nlm.nih.gov.

7

plaintiff's diagnoses were the direct result of the injuries she sustained in the fall on August 21, 2006.  (Tr. 296).  Dr. Cohen also stated that plaintiff had a 20% whole person disability at the level of the cervical spine, 15% whole person disability at the level of the lumbar spine, and 30% permanent partial disability at plaintiff's right elbow.  (Tr. 296).

On June 15, 2007, plaintiff was seen by Dr. Hawatmeh after reporting migraine headaches and body aches.  (Tr. 395).  Ten days later, on July 25, 2007, Dr. Cohen stated in a letter that "due to Ms. Allen's multiple medical problems she is unable to work at this time."  (Tr. 382).

On October 24, 2007, plaintiff went back to Dr. Hawatmeh and reported that her migraines were getting worse and were occurring four times a week.  (Tr. 392).  Dr. Hawatmeh prescribed Maxalt for plaintiff's headaches and Cymbalta for fibromyalgia pain.  (Tr. 392).  On November 17, 2007, plaintiff was examined by Lance Govreau D.C. (Tr. 261).  Plaintiff complained of stiffness in her neck and entire back.  (Tr. 261).  After examining plaintiff and releasing her from chiropractic care on November 26, 2007, Dr. Govreau concluded plaintiff had "reached the point of maximum chiropractic improvement."  (Tr. 264).  However, "due to permanent nature of the injuries sustained, [plaintiff] is expected to have degenerative changes and therefore her outlook for future treatment need is considered probable."  (Tr. 264).

On November 28, 2007, plaintiff went back to Dr. Hawatmeh with complaints of headaches and body pain.  (Tr. 396).  Dr. Hawatmeh's diagnosis was fibromyalgia.  In January 2008, plaintiff went to Sona Kamat M.D., a rheumatologist.  Dr. Kamat confirmed the diagnosis of fibromyalgia.  (Tr. 273).  Dr. Kamat also diagnosed plaintiff with arthralgias, myalgias, fatigue, recurrent falls and Raynaud's syndrome.  (Tr. 273).

On January 30, 2008, Dr. Hawatmeh stated that because of plaintiff's medical conditions, she "is going to continue to have chronic pain and this will affect her ability to work." (Tr. 380).  On February 4, 2008, Dr. Kamat examined plaintiff again and found no deformity of her shoulders, elbows, hands, knees, and left foot. (Tr. 271). Dr. Kamat concluded that plaintiff was exhibiting a full range of motion in her shoulders, elbows, hands and knees.  (Tr. 271).

On April 8, 2008, Dr. Cohen performed a supplemental medical rating on plaintiff. (Tr. 288). Dr. Cohen obtained x-rays of plaintiff's shoulders, wrists, ankles, elbows and sacroiliac joints. (Tr. 288-289). The elbow x-rays showed an impression of mild osteoarthritis of the humeral/ulnar joint. (Tr. 288). All the other x-rays and the laboratory results were negative. (Tr. 289). Examination, however, revealed multiple tender areas throughout plaintiff's body and reduced range of motion in her cervical range. (Tr. 289). Dr. Cohen diagnosed plaintiff with moderately severe cervical myofascial pain disorder with cervicogenic headaches, chronic lumbar strain with myalgia, and fibromyalgia. (Tr. 290). Dr. Cohen also concluded that plaintiff suffered from an additional 20% whole person disability from the fibromyalgia. (Tr. 290).

On July 11, 2008, plaintiff was admitted to the emergency room after stumbling on a 4-inch hole in the street. (Tr. 480). She reported numbness and tingling in her arms and pain in her legs, neck, and back. (Tr. 480). Plaintiff was diagnosed with diffuse muscle aches and fibrmyalgia. ( Tr. 487). Plaintiff was prescribed Oxycodone, Lorazepam, and morphine for pain.[11] (Tr. 488-489). On July 14, 2008, plaintiff went

---

[11]Oxycodone  is also known as Percocet.  Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

9

to the emergency room again, complaining of pain and shortness of breath. X-rays and examination did not show any respiratory problems. ( Tr. 463-463). Plaintiff was given Oxycodone for pain. (Tr. 464).

On July 29, 2008, plaintiff was seen by Russell Cantrell, M.D. (Tr. 405). Plaintiff reported diffuse pain, paresthesias, and fatigue. (Tr. 400). Dr. Cantrell performed an independent medical evaluation and reviewed plaintiff's medical history. (Tr. 400-404). Dr. Cantrell noted that plaintiff's complaints were inconsistent with the examination results. (Tr. 402). For instance, Dr. Cantrell found that plaintiff was able to change clothes independently, even though she complained of severe lumbar pain. (Tr. 402). Dr. Cantrell concluded that plaintiff was capable of performing regular work without any restrictions. (Tr. 405). According to Dr. Cantrell, plaintiff had reached maximum medical improvement and had five-percent permanent partial disability in regards to her cervical strain, and three-percent in regards to her lumbar strain. (Tr. 405).

From July 2009 to August 2009, plaintiff was seen by Dr. Hawatmeh and Dr. Kulczycki on numerous occasions. (Tr. 542, 408). Both doctors continued to diagnose plaintiff with fibromyalgia, migraine headaches, and allergic rhinitis. (Tr. 542, 543, 408).

### IV. The ALJ's Decision

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since September 20, 2006 the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

---

Lorazepam is used to relieve anxiety.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/

3. The claimant has the following severe impairments: fibromyalgia, oestoarthritis, and chronic fatigue syndrome (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairment that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1 (20 CFR 404.1520(d), 404.1525, 404, 1526, 416.960(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, she can lift and carry ten pounds, stand or walk two out of eight hours, and sit six out of eight hours for a total of eight out of eight hours. She may occasionally climb, balance, stoop, crouch, kneel or crawl and may occasionally use the upper extremities for reaching. She should never climb ladders, ropes, or scaffolds. The claimant should avoid concentrated exposure to dusts, fumes, gases, chemicals, humidity, temperature extremes and vibrations.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 19, 1977 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with job existing in significant numbers in the national economy (20 CFR 404.1569, 4904.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d)).

11. The claimant has not been under disability, as defined in the Social Security Act from September 30, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of

12

performing any other work in the national economy.  If the claimant is not, she is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because the evidence could support a contrary outcome.  Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the

Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B.     Plaintiff's Allegations of Error

Plaintiff asserts that the ALJ failed to consider all of her severe medically determinable impairments.  According to plaintiff, the ALJ failed to consider her headaches, allergies, and asthma in determining whether she qualified for benefits. Plaintiff also contends that the ALJ failed to properly consider the side-effects of her medication, mischaracterized the medical reports of Dr. Taylor, and failed to consider evidence supporting her diagnosis of fibromyalgia.   As such, plaintiff claims that the ALJ's conclusions are not supported by substantial evidence.

### 1. Medically Determinable Impairment

Plaintiff first argues that the ALJ failed to consider her headaches, allergies, and asthma as severe impairments. To show an impairment is severe, a plaintiff must show that she has a (1) medically determinable impairment or combination of impairments which (2) significantly limits his physical or mental ability to perform basic work activities without regard to age, education, or work experience. See 20 C.F.R. §§ 404.1520(c), 404.1521(a), §§ 416.920 (c), 416.921(a).  An impairment is non-severe if it is not "medically determinable" or has no more than a minimal effect on the plaintiff's ability to work. Nguyen v. Charter, 75 F.3d 429,431 (8th Cir. 1996).

The ALJ found that plaintiff's headaches were not severe as defined by the Social Security Act. (Tr. 12). The Court finds that substantial medical evidence supports this determination.  Although plaintiff reported headaches from 2006 to 2009, medical

14

records indicate that medication helped reduce the severity of her headaches. For instance in 2006, Plaintiff told Dr. Cohen that her medication helped relieve her headaches. (Tr. 293). Plaintiff stated that taking Midrin three or four times a week made her headaches less severe so that she could participate in most of her activities. (Tr. 293). At the hearing, plaintiff also testified that Maxalt helped reduced her headache pain so that she could "get up and do something." (Tr. 55).

The ALJ also found that plaintiff's allergies and asthma were not severe impairments. The Court finds that medical evidence supports this determination, even though the ALJ included asthma- and allergy-related restrictions in the residual functional capacity (RFC) determination. Plaintiff was prescribed several medications for her allergies and asthma. In 2009, plaintiff stated that some of the medications improved her allergy symptoms. (Tr. 408). Also, in February 2009, plaintiff informed Dr. Kulczycki that she had not used her breathing medication since 2008. (Tr. 408). Furthermore, there is no evidence in the record indicating that plaintiff's allergies prohibited her from performing daily activities. Because medical records indicate that plaintiff's headaches, allergies, and asthma improved with treatment and did not hinder her daily activities, the Court finds that the ALJ's determination that plaintiff's impairments were not severe is supported by substantial evidence.

Plaintiff also argues that the ALJ failed to consider her chronic fatigue syndrome in determining her RFC, and therefore, the ALJ's determination is not supported by substantial evidence. This argument is without merit. Although the ALJ did not include chronic fatigue syndrome in plaintiff's RFC, there is no evidence that plaintiff's chronic fatigue syndrome limited her ability to perform daily activities.

**2. Credibility Determinations**

Plaintiff next argues that the ALJ incorrectly assessed plaintiff's credibility. Specifically, plaintiff claims that the ALJ did not consider the side effects of plaintiff's medication and failed to consider objective evidence supporting plaintiff's diagnosis of fibromyalgia.

"[W]hen assessing whether a claimant's subjective complaints are credible, the ALJ must consider all of the evidence, including claimant's work history and observations regarding: (1) claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) the dosage, effectiveness and side effects of medication; (4) any precipitating and aggravating factors; and (5) claimant's functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1321 (8th Cir. 1984). The ALJ is not required to discuss each Polaski consideration, as long as the considerations were acknowledged and examined prior to discounting the claimant's subjective complaints. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

Plaintiff argues that the ALJ failed to consider medical records where plaintiff reported side effects of Evail.[12] (Tr. 522). In 2008, plaintiff informed Dr. Kamat that Elavil affected her personality. (Tr. 522). The Court finds that the ALJ did not err in failing to address plaintiff's side effects to Elavil. Plaintiff's prescription for Elavil was discontinued once she reported personality changes. (Tr. 522). Since that time, plaintiff has been on Cymbalta. (Tr. 522). At the hearing, plaintiff testified that she primarily takes Cymbalta for fibromyalgia pain. She did not discuss any other medications, including Elavil. (Tr. 38). Furthermore, plaintiff has not reported any medical side effects to Cymbalta. (Tr. 38). In fact, plaintiff has suggested that

---

[12]Elavil is an antidepressant drug.  http://www.medicinet.com/amitriptyline

Cymbalta reduces her fibromyalgia pain. (Tr. 522). Therefore, the ALJ did not err in failing to address plaintiff's side effects to Elavil.

Plaintiff also contends that the ALJ did not consider objective evidence supporting the diagnosis of fibromyalgia. Plaintiff asserts that because this diagnosis was made by several doctors, the ALJ should have believed plaintiff's testimony that she was disabled due to fibromyalgia. After reviewing medical reports, the ALJ acknowledged plaintiff's diagnosis of fibromyalgia and concluded that plaintiff was not disabled under the Social Security Act. (Tr. 13-15).

The Court finds that this determination is supported by substantial evidence. In 2006, after plaintiff's injury at Walgreens, Dr. Taylor stated that plaintiff had reached maximum medical improvement and that she could return to work without any restrictions. (Tr. 362). In 2008, after plaintiff was diagnosed with fibromyalgia, Dr. Kamat reported that plaintiff had full range of motion in her shoulders, elbows, knees, and left foot. (Tr. 271). Also in 2008, Dr. Cantrell stated that plaintiff only had three percent partial disability in the lumbar strain and five percent in the cervical strain, and that she could return to work without any restrictions. (Tr. 405). Additionally, medical reports indicate that plaintiff was exaggerating her level of pain. In October 2006, Dr. Taylor reported that plaintiff's physical complaints were inconsistent with the injury that she sustained. (Tr. 358). Likewise, in 2008, Dr. Cantrell stated that plaintiff's complaints did not match her physical abilities. (Tr. 402). Specefically, Dr. Cantrell noted that although plaintiff reported intense lumbar back pain, she was able to change her clothing independently. (Tr. 402). Dr. Cantrell also noted that plaintiff complained of pain in every part of her body, not just the trigger points associated with a diagnosis of fibromyalgia. (Tr. 402). Medical reports also indicate that plaintiff's condition

improved after taking Cymbalta. (Tr. 522). The foregoing constitutes substantial evidence supporting the ALJ's determination.

### 3. Dr. Taylor's Opinion

In October 2006, plaintiff was examined by Dr. Taylor. (Tr. 362). Dr. Taylor found that plaintiff had reached "maximum medical improvement in regard to her spine," and could return to work. (Tr. 362). Plaintiff claims that because Dr. Taylor referred only to improvement in plaintiff's spine, the ALJ mischaracterized the statement as support for his determination plaintiff was not disabled by fibromyalgia. was misplaced, because Dr. Taylor was referring only to the improvement in plaintiff's Plaintiff's argument is without merit. Indeed, Dr. Taylor mentioned only plaintiff's spine in his assessment of her medical improvement. However, Dr. Taylor also opined that plaintiff was able to return to work. Furthermore, the ALJ's determination did not rest solely on Dr. Taylor's statement. The ALJ also relied on the medical reports of Dr. Cantrell, who similarly stated that plaintiff could return to work. Also, Dr. Kamat reported that plaintiff's health condition improved within a year after being diagnosed with fibromyalgia. (Tr. 271). Accordingly, the Court finds that the ALJ did not mischaracterize Dr. Taylor's opinion and that the determination that plaintiff is not disabled is supported by substantial evidence.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore the plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint [#1] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 27th day of September, 2011.